IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

HARTFORD LIFE AND ACCIDENT ) 
INSURANCE CO., ) Civil No. 04-1768-PA
 )
        Plaintiff, ) **FINDINGS OF FACT AND**
 ) **CONCLUSIONS OF LAW**
    v. )
 )
PREMIUM ESCROW SERVICES, INC.,)
ROBERTA MATOT PACKARD, )
TIMOTHY JOSHUA MATOT, IAN )
MATOT, and TROY MATOT, )
 )
        Defendants. )

**PANNER, J.**

Plaintiff Hartford Life and Accident Insurance Company ("Hartford") brings this interpleader action to determine the proper recipients of the proceeds of a life insurance policy issued to William B. Matot ("Decedent"). Defendants Roberta Matot Packard, Timothy Josh Matot, Ian Matot and Troy Matot ("the Matots"), and Premium Escrow Services, Inc., ("Premium"), each claim to be the rightful beneficiary under the policy.

I conducted a court trial on June 14, 2005. The parties stipulated that, if called, each witness would testify in accordance with the statement proffered for that witness. The

1 - OPINION AND ORDER

parties jointly submitted exhibits, the authenticity of which is not in question.

I now issue my findings of fact and conclusions of law in accordance with Federal Rule of Civil Procedure 52(a).[1]

## **FINDINGS OF FACT**

The facts are largely undisputed. Decedent and Roberta Matot married and had three children: Timothy Josh, Ian, and Troy. In 1992, Decedent enrolled in a Supplemental Life Insurance Plan through his employer Costco Wholesale Group. The $250,000 policy named Roberta Matot as primary beneficiary. Decedent submitted several "enrollment documents" between 1992 and 1996.[2] An "enrollment application" in May 1995 listed Roberta Matot as primary beneficiary, and William D. Matot, the Decedent's father, as secondary beneficiary. A November 1995 enrollment document named only Roberta Matot as beneficiary.

On July 14, 1996, Decedent submitted an enrollment document naming his father as primary beneficiary, his three sons as secondary beneficiaries, and omitting Roberta Matot entirely. Decedent wrote at the top of the document "Cancel Spouse," and also represented that he was then "Divorced." That was false.

On October 23, 1996, Roberta Matot and Decedent divorced.

---

[1] Any finding of fact more properly characterized as a conclusion of law, and any conclusion of law more properly deemed a finding of fact, should be so construed.

[2] It is unclear whether the "enrollment documents" technically created a new policy or merely changed the beneficiary designation on the existing policy. Neither party contends the distinction is material.

The Stipulated Judgment of Dissolution of Marriage ("Stipulated Judgment") required Decedent to maintain the $250,000 Hartford policy, with Roberta Matot as beneficiary for $50,000 and their three children as beneficiaries equally for the remaining $200,000. The Stipulated Judgment also states:

> Each party shall provide a certified copy of this judgment to the appropriate insurance companies, in accordance with the provisions of ORS 107.820(6), notifying said companies as to the terms of this judgment ... and instruct such companies to update the records to guarantee compliance with this provision ....

The parties have found no proof the Stipulated Judgment was furnished to Hartford. The attorney who represented Roberta Matot during the divorce concedes he failed to comply with that requirement. He says he relied instead upon a representation that Decedent's then attorney (now deceased) would perform that task, but never verified it had been done.

The Judgment referenced ORS 107.820(6), which provides that:

> Life insurance retained ... for the purpose of protecting the support ... obligation shall not be reduced by loans or any other means of reduction until the obligation has been fulfilled. *The obligee or the attorney of the obligee shall cause a certified copy of the judgment to be delivered to the life insurance company* .... If the obligee or the attorney of the obligee delivers a true copy of the judgment to the life insurance company ... identifying the policies involved and requesting such notification under this section, the company ... *shall notify the obligee, as beneficiary of the insurance policy, whenever the policy holder takes any action that will change the beneficiary or reduce the benefits of the policy.*

(emphasis added).[3]  This was a mandatory duty, yet there is no

evidence the Matots' then-attorney performed that duty.[4]

Had that been done, the Matots would have learned that

Decedent had changed his beneficiary before executing the

Stipulated Judgment.  Neither the children nor Roberta Matot were

the named primary beneficiary (as represented in the Stipulated

Judgment).  Furnishing a copy of the Stipulated Judgment to

Hartford also would have placed Hartford on notice not to

authorize any subsequent assignment or change of beneficiary that

conflicted with the terms of the Stipulated Judgment.

On or about April 29, 1997, Decedent sold the insurance

policy to Beneficial Assistance, Inc., for $154,640.00.  Pursuant

to the contract for sale, Decedent assigned his rights in the

policy to William R. Evans, Chartered ("Evans"), which then

designated itself as beneficiary.  On June 19, 1997, Hartford

consented to the assignment.  Evans later assigned its rights in

_____

[3]  While the Stipulated Judgment does not compel either
party to pay a set monthly amount of child support to the other,
the insurance policy nevertheless qualifies as "[l]ife insurance
retained or purchased by an obligor ... for the purpose of
protecting the support ... obligation" within the meaning of ORS
107.820(6).  Consistent with Oregon law, and the terms of that
Judgment, each party assumed an obligation to contribute equally
to the children's support.  See Matter of Marriage of Willey, 155
Or. App. 352, 357 (1998) ("Although wife does not have a net
child support obligation, she does have a support obligation
under the shared custody child support obligation").

[4]  The attorney who represented Roberta Matot during the
divorce now asserts that the mutual notice provision was a
"'boiler plate' form provision and did not have any practical
effect as to Roberta Matot as she did not have her own insurance
or an obligation to continue to provide insurance."  That is
incorrect.  The obligees included Roberta Matot and her children.
ORS 107.820(6) places the duty to notify squarely on the obligee,
and for good reason, as this case aptly illustrates.

the policy to Premium, which named itself beneficiary.  Following
the 1997 assignment, Premium (or its predecessors) made the
premium payments to keep the policy in force.

Beneficial, Evans and Premium did not have actual knowledge
of the Stipulated Judgment requirement that Decedent maintain his
ex-wife and children as beneficiaries of the policy.  Before
consummating this purchase, neither Evans nor Beneficial
conducted any investigation apart from confirming Decedent's
health status and requesting Hartford's consent to the
assignment.  There is no evidence Evans or Beneficial asked
Decedent about his marital status, divorce history, or potential
obligations to his minor children or ex-wife.  Nor did they check
the public records in Clackamas County, where Decedent resided
and the Stipulated Judgment was filed.

By 1997, when Decedent assigned the policy, it was not
unusual for divorce decrees to include provisions regarding life
insurance policies, or for ex-spouses to violate those
provisions.[5]  Beneficial, Evans, and Premium regularly purchased
life insurance policies.  They should have been aware of the
potential pitfalls and had procedures to protect themselves.
However, Premium concedes it has no evidence of "any formal
policies or procedures existing at any time with respect to the
purchases of life insurance policies by Evans or Premium Escrow."

---

[5]  See Sinsel v. Sinsel, 47 Or. App. 153 (1980); Gander v.
Livoti, 250 F.3d 606 (8th Cir. 2001); Metropolitan Life Ins. Co.
v. Cronenwett, 162 F. Supp. 2d 889 (S.D. Ohio 2001);  Oregon
Pacific State Ins, Co., v. Jackson, 162 Or. App. 654 (1999).

Knowledge that Decedent had recently been divorced, had custody of three minor children, and was terminally ill, should have been a red flag for any company experienced in such matters, demanding further inquiry. Had Premium or its predecessors investigated this purchase, they likely would have uncovered both the Stipulated Judgment and 1996 enrollment document. This would have put them on notice of Decedent's divorce and the Matots' interests in the policy.[6]

The Stipulated Judgment gave Roberta Matot the right to demand proof her ex-husband was maintaining the insurance policy as required. There is no evidence she did so during the nearly seven-year period between the divorce and her ex-husband's death.

Decedent died on June 21, 2003. Both Premium and Roberta Matot (for herself and the children) claimed the policy proceeds. Premium's claim, based on the assignment from Decedent, was submitted to Aetna, which was now administering the plan for Hartford. Roberta Matot's claim, based on the 1996 Stipulated Judgment, was submitted to Hartford. Roberta Matot subsequently withdrew her personal claim and authorized the full amount to be paid equally to the three sons pursuant to the 1996 enrollment document. The sons were named only as secondary beneficiaries in that document, but the primary beneficiary was now deceased. Unaware of Premium's competing claim, Hartford paid one-third of

---

[6] Premium offers no evidence its predecessors were aware of ORS 107.820(6) when they contracted with Decedent, or that they detrimentally relied upon that statute. Premium admittedly did not rely upon the provisions in the Stipulated Judgment which required the parties to the divorce to give notice to Hartford.

the proceeds to Timothy Josh Matot.  Upon learning of Premium's competing claim, Hartford deposited the remaining funds with the court and filed this interpleader action.

## CONCLUSIONS OF LAW

### A.    Contentions of the Parties

Premium contends it is entitled to the policy proceeds as a bona fide purchaser, having acquired (through mesne conveyances) Decedent's rights to the policy without notice of the Matots' prior rights.  Premium also asks that a constructive trust be imposed upon the portion of the policy proceeds already paid to Timothy Josh Matot.

The Matots counter that the attempted assignment to Premium's predecessor was ineffective, because Decedent was incapable of conveying rights he no longer controlled.  The Matots contend that when Decedent entered into the Stipulated Judgment, he equitably and irrevocably assigned those rights to Roberta Matot and the children, and disabled himself from altering the beneficiary designation.  Alternatively, the Matots seek to enforce the July 14, 1996 beneficiary designation naming the Matot children as beneficiaries, again on the theory that Decedent disabled himself from altering that beneficiary designation in a manner adverse to the children.

The Matots also point to section 5(a) of the Stipulated Judgment, which mandates that a constructive trust be imposed upon the proceeds of the policy in the event that, at death, "said insurance is in force, but another beneficiary is

designated to receive such funds."  That very circumstance

occurred here.  At best, the Matots reason, Premium[7] is the

intended recipient of a breach of fiduciary duty, which the law

cannot sanction by enforcing the tainted assignment.  See Compton

v. Compton, 187 Or. App. 142, 147-48 (2003) (courts will not

enforce contract that violates public policy); Gander, 250 F.3d

at 611 (father breached fiduciary duty to minor child by

executing release on her behalf that authorized substituting

beneficiaries on life insurance policy in manner contrary to

terms of divorce decree establishing trust for child's benefit).

Premium responds that this case falls within the narrow

exception that protects bona fide purchasers for value who act in

good faith, without notice of the breach of duty or of the prior

interest.  See Akin v. Security Savings & Trust Co., 157 Or. 172,

183 (1937); Akins v. Vermast, 150 Or. App. 236 (1997).  The

parties disagree as to what form of notice is necessary, and

whether Premium had such notice here.[8]

---

[7] To simplify the opinion, I will refer to both Premium and
its predecessors, collectively, as "Premium" unless otherwise
stated.  As a practical matter, Premium stands in the shoes of
its assignor, can acquire no better title than was possessed by
its predecessors, and is subject to the same defenses.

[8] A subsequent purchaser is on notice of a breach of trust,
or of a prior interest, when the purchaser (A) has actual
knowledge of it, or (B) has knowledge of facts that would lead a
reasonable person to inquire whether a breach of trust or a prior
interest exists, and such inquiry would likely have disclosed the
breach or prior interest.  See Clearwater v. Wagner, 272 Or. 491,
496 (1975); Belt v. Matson, 120 Or. 313, 320 (1927); Houck v.
Feller Living Trust, 191 Or. App. 39, 44 (2003); Sinsel, 47 Or.
App. at 158-59.  Cf. Gander, 250 F.3d 606 (buyer of interest in
life insurance policy, through viatical agreement, did so at own
risk by failing to adequately investigate whether seller could
lawfully transfer ownership; buyer therefore could not claim

Premium further contends that the Matots' claim fails because the Matots did not comply with the notice provisions in the Stipulated Judgment or ORS 107.820(6).

The Matots counter that the 1996 enrollment document, which named the Matot children as secondary beneficiaries and contained the language "Cancel Spouse" and "Divorced," provided constructive notice to Evans of the Stipulated Judgment and the children's competing claims, thereby defeating Premium's claim to be a bona fide purchaser without notice. The Matots also assert that Premium had notice, or should have been aware of facts giving rise to a duty to inquire before purchasing the policy, that would have revealed Decedent's deception and the Matots' rights to the proceeds.

## B. **Whether this Action is Controlled by ERISA or Oregon Law**

The arguments of the parties focused upon Oregon law. After taking the matter under advisement, I requested supplemental briefing on whether this action is controlled by the Employee Retirement Income and Security Act ("ERISA"), 29 U.S.C. § 1001 et seq., or if Oregon law is paramount here.

The parties agree that Decedent's life insurance policy was part of an employee welfare benefit plan, and thus within the scope of ERISA, at least initially. ERISA ordinarily requires the Plan Administrator to award life insurance benefits in accordance with the Plan documents. See Riordan v. Commonwealth

---

"bona fide purchaser" status even though he had paid value and lacked actual notice of competing interests).

Edison Co., 128 F.3d 549, 553 (7th Cir. 1997) (with limited
exceptions, ERISA compels plan fiduciary to pay benefits to the
beneficiary properly designated under the terms of the Plan);
Metropolitan Life Ins. Co. v. Pressley, 82 F.3d 126, 130 (6th
Cir. 1996) (plan administrator must follow plan documents to
determine designated beneficiary); 29 U.S.C. § 1104(a)(1)(D) (an
ERISA "fiduciary shall discharge his duties" "in accordance with
the documents and instruments governing the plan insofar as such
documents and instruments are consistent with the provisions of
this subchapter and subchapter III of this chapter"). Here, the
applicable plan document is the 1997 assignment of benefits from
Decedent to Evans, predecessor in interest to Premium.

With limited exceptions, ERISA also preempts "any and all
State laws insofar as they may ... relate to any employee benefit
plan ...." 29 U.S.C. § 1144(a). See also Boggs v. Boggs, 520
U.S. 833 (1997) (ERISA preempts state community property law
conflicting with ERISA's anti-alienation provision). ERISA
defines "State law" so broadly, 29 U.S.C. § 1144(c)(1), that
courts have construed that phrase to encompass even a divorce
decree or property settlement. See Metropolitan Life Ins. Co. v.
Pettit, 164 F.3d 857, 861 (4th Cir. 1998); Carland v.
Metropolitan Life Ins. Co., 935 F.2d 1114, 1119 (10th Cir. 1991).

In 1984, Congress amended ERISA to carve out an exception
for "qualified domestic relations orders" ("QDROs"). Retirement
Equity Act of 1984, Pub. L. No. 98-397, 98 Stat. 1426. As a
result, ERISA's broad preemption clause does "not apply to

qualified domestic relations orders (within the meaning of
section 1056(d)(3)(B)(i) of this title)[.]" § 1144(b)(7).

### 1. __Whether the Stipulated Judgment is a QDRO__

QDROs are a subset of "domestic relations orders" ("DROs").
Trustees of the Directors Guild of America-Producer Pension
Benefits Plans v. Tise, 234 F.3d 415, 420 (9th Cir. 2000),
*amended*, 255 F.3d 661 (2001).  DROs are any orders relating "to
the provision of child support, alimony, or marital property
rights to a spouse, former spouse, child, or other dependent of a
plan participant ... made pursuant to a State domestic relations
law."  29 U.S.C. § 1056(d)(3)(ii).  The parties agree the
Stipulated Judgment is a DRO, but disagree on whether it is a
QDRO.

A DRO is a QDRO if it "creates or recognizes the existence
of an alternate payee's right to, or assigns to an alternate
payee the right to, receive all or part of the benefits payable
with respect to a participant under a[n ERISA] plan,"
§ 1056(d)(3)(B), and the DRO meets the other requirements of that
section.  An "alternate payee" is "any spouse, former spouse,
child, or other dependent of a participant who is recognized by a
domestic relations order as having a right to receive all, or a
portion of, the benefits payable under a plan with respect to
such participant."  § 1056(d)(3)(K).  With respect to the
Stipulated Judgment, Roberta Matot and the Matot children are
"alternate payees" for purposes of § 1056(d)(3).

/ / / /

To qualify as a QDRO, a DRO must not require the plan to (1) provide any type of benefit not otherwise provided, or (2) provide increased benefits, or (3) require benefits to be paid to an alternate payee which must be paid to another alternate payee under another QDRO. 29 U.S.C. § 1056(d)(3)(D). The parties agree that the Stipulated Judgment satisfies these requirements. Finally, § 1056(d)(3)(C) states that:

> A domestic relations order meets the requirements of this subparagraph only if such order clearly specifies--
>
> > (i) the name and the last known mailing address (if any) of the participant and the name and mailing address of each alternate payee covered by the order,
> >
> > (ii) the amount or percentage of the participant's benefits to be paid by the plan to each such alternate payee, or the manner in which such amount or percentage is to be determined,
> >
> > (iii) the number of payments or period to which such order applies, and
> >
> > (iv) each plan to which such order applies.

The parties dispute whether these requirements are satisfied by the Stipulated Judgment. From the face of that document, there is no evidence that Roberta Matot's former attorney made a conscious effort to comply with these statutory requirements. However, that is not necessarily fatal, as Premium candidly acknowledges. Supplemental Brief at 5 ("this Court will likely conclude that the 1996 Judgment constitutes a QDRO, notwithstanding the omissions identified by Premium").

On its face, the requirements of § 1056(d)(3)(C) appear absolute.  The words "only if such order clearly specifies" seem to leave little room for doubt.  Nevertheless, some "courts have liberally construed the criteria by which a domestic relations order will qualify as a QDRO."  Stewart v. Thorpe Holding Co. Profit Sharing Plan, 207 F.3d 1143, 1153 (9th Cir. 2000).  The Ninth Circuit, in its wisdom, has decided that a DRO qualifies as a QDRO so long as it "substantially complies" with the requirements of § 1056(d)(3)(C).  Tise, 234 F.3d at 420, citing Stewart, 207 F.3d at 1153.

The first statutory requirement is that the DRO specify "the name and the last known mailing address (if any) of the participant[,]" i.e., the Decedent William Matot.  The Judgment specifies his name, but does not explicitly state that a particular address is his last known mailing address.  Despite that omission, in this Circuit it is sufficient if the mailing address was already known to the Plan Administrator, or the Order includes a mailing address for the participant's attorney, or if the Order awards a residence to the participant and the Order recites that address.  Stewart, 207 F.3d at 1151-52.  All three of those circumstances are true here.  See also S. Rep. No. 575, 97th Cong., 2d Sess., reprinted in 1984 U.S.C.C.A.N., at 2457, 2566 ("The Senate committee intends that an order will not be treated as failing to be a qualified order merely because the order does not specify the current mailing address of the participant ... if the plan administrator has reason to know that

address independently of the order").

The second requirement is that the DRO indicate the name and mailing address of each alternate payee covered by the order. As to the three Matot children, the Judgment awards the Decedent physical custody of the three minor children. Their mailing address therefore was the same as his mailing address, and the latter has been adequately established. That is sufficient to satisfy § 1056(d)(3)(C)(i). See Metropolitan Life Ins. Co. v. Wheaton, 42 F.3d 1080, 1084 (7th Cir. 1994); Metropolitan Life Ins. Co. v. Marsh, 119 F.3d 415, 422 (6th Cir. 1997); Metropolitan Life Ins. Co. v. Fowler, 922 F. Supp. 8, 14 (E.D. Mich. 1996). The Judgment also includes the full name and birth date of each child, which aids in identification. Cf. Stewart, 207 F.3d at 1151 (courts "have liberally interpreted the address requirement for a valid QDRO in light of its purpose as an 'aid [to] plain administrators in identifying and locating alternate payees under a QDRO'").

The status of Roberta Matot is a little more problematic. However, this Circuit has adopted the view that "[b]ut for the lack of one easily-ascertainable address, the rights of the alternate payee should not be lost." Stewart, 207 F.3d at 1151, quoting Stinner v. Stinner, 554 A.2d 45, 49 (Penn. 1989). Stewart cited with approval a decision which held "that ERISA's QDRO mailing address requirement is satisfied where the address of the participant's attorney only appears on the divorce judgment and the participant and ex-spouse were in contact with

each other after the divorce").  <u>Stewart</u>, 207 F.3d at 1151,

citing <u>In re Williams</u>, 50 F. Supp.2d 951, 959-60 (C.D. Calif.

1999).  That factual prerequisite is satisfied here.

The Stipulated Judgment also recites the name and bar number

of Roberta Matot's divorce counsel, whose address was at all

times on file with the state Bar Association, it recites Roberta

Matot's date of birth, social security number, and maiden name,

and it lists the name, mailing address, and telephone number of

the attorney who prepared the DRO.  <u>Cf.</u> <u>Tise</u>, 234 F.3d at 426

(because the Order included an address for the alternate payee's

attorney, "it would be a simple enough matter for the Plan to

locate [her] for payment"); <u>Metropolitan Life Ins. Co. v.

Williams</u>, 82 F. Supp.2d 1346, 1352-53 (M.D. Fla. 1999) (omission

of address not fatal, as it could easily be obtained from the

attorney who prepared the DRO, whose address and telephone number

were on the document).

In addition, Roberta Matot lodged a claim with Hartford

following her ex-husband's death.  Hartford thus knew she was

asserting a claim, and knew how to contact her.  <u>Cf.</u> <u>Tolstad v.

Tolstad</u>, 527 N.W.2d 668, 673 (N.D. 1995) ("the statutory

requirements are satisfied when the plan administrator has

knowledge of the identity of the alternate payee and an address

to contact her").[9]

---

[9]  Notably, the statutory requirement is for the mailing
address at the time the DRO was entered.  That address may be
long outdated when the matter finally comes to the attention of
the Plan Administrator.  <u>Cf.</u> <u>Marsh</u>, 119 F.3d at 417 (divorce
decree had been issued 17 years before).  This confirms the

The next requirement is that the DRO specify "the amount or percentage of the participant's benefits to be paid by the plan to each such alternate payee, or the manner in which such amount or percentage is to be determined." The Stipulated Judgment specifies that Roberta Matot is to receive $50,000, and the remaining $200,000 is to be divided equally among the three children. This requirement is therefore satisfied.

The DRO must also specify "the number of payments or period to which such order applies[.]" Unless the policy specifies otherwise, life insurance is customarily paid in a single lump sum. The Judgment does not decree otherwise. "Given the nature of the policy, the 'number of payments' is, obviously, 'one.'" Metropolitan Life Ins. Co. v. Cronenwett, 162 F. Supp.2d 889, 896 (S.D. Ohio 2001). Accordingly, this requirement is deemed to have been satisfied. See Stewart, 207 F.3d at 1152 ("because no periodic payments were contemplated, there was no need . . . to determine the number of payments affected by the order").[10] "[T]he likelihood that a plan administrator would be confused as to how to implement the DRO provisions relating to whom to pay and when is particularly low in this case." In re Williams, 50 F. Supp.2d at 958, n.9.

_____

intent of Congress was mostly pragmatic, namely, to ensure the Administrator could accurately identify and locate the intended payee. The address has no independent significance.

[10] Accord Marsh, 119 F.3d at 422 ("Since this was a life insurance policy to be paid in a lump sum on decedent's death and not payments from a pension plan, there was no need to specify the number of payments or periods for which the order applies").

Finally, the DRO must specify "each plan to which such order applies." The Stipulated Judgment identifies the plan as the "$250,000 face value life insurance policy written in connection with his employment at Costco." That is sufficient to identify the policy in question. Cf. Wheaton, 42 F.3d at 1084 (reference to "the life insurance which is presently carried through his/her employer" was sufficiently precise), *cited with approval by* Stewart, 207 F.3d at 1154.[11]

The Stipulated Judgment "substantially complies" with the requirements of § 1056(d)(3)(C), and fully complies with § 1056(d)(3)(D). In this Circuit, that is sufficient to treat the Stipulated Judgment as a QDRO. Tise, 234 F.3d at 420.[12]

---

[11] See also Tolstad, 527 N.W.2d at 673 (reference to life insurance policy furnished by decedent's employer was adequate; he "had only one employer and only one insurance plan furnished by that employer"); Metropolitan Life Ins. Co. v. Bigelow, 283 F.3d 436, 444 (2d Cir. 2002) ("a General Electric insurance plan" was sufficient description); Smith v. Estate of Smith, 248 F. Supp.2d 348, 357 (D. N.J. 2003) (QDRO need not identify plan "by its specific name" if otherwise clear which plan the order refers to); Seaman v. Johnson, 184 F. Supp.2d 642, 647 (E.D. Mich. 2002) ("any life insurance policies he may by virtue of his employment have with Chevrolet V-8" was adequate); Fowler, 922 F. Supp. at 14 ("any and all life insurance policies by virtue of their employment" deemed sufficient); Aetna Life Ins. Co. v. Hager, 930 F. Supp. 343, 347 (E.D. Wisc. 1996) ("life insurance that is provided through his employment" sufficient description). But cf. Metropolitan Life Ins. Co. v. Mulligan, 210 F. Supp.2d 894, 898 (E.D. Mich. 2002) ("any policy or contract of life insurance, endowment or annuity" not precise enough); Sun Life Assurance Co. of Canada, 206 F. Supp.2d 191, 197 (D. Mass. 2002) ("his group life insurance" not precise enough; decedent was not employed by this company until 15 years after the DRO was signed).

[12] That the Plan Administrator received a copy of the QDRO only after the participant's death is of no consequence, at least on the facts of this case. See Smith, 248 F. Supp.2d at 359.

## 2. __Significance of Determination that Stipulated Judgement is a QDRO__

In Premium's view, "a finding that the 1996 Judgment is a QDRO should have no effect on the parties' respective rights to the Policy proceeds." "[T]he only consequence of finding that the 1996 Judgment constitutes a QDRO is to expressly nullify the preemption provisions of ERISA ... thereby confirming the application of state law to resolve the central issue of this case." Premium's Supplemental Brief at 6. I disagree.

When a dispute concerns pension benefits, the applicable rule is quite clear. § 1056(3)(d)(3)(A) states that "[e]ach pension plan shall provide for the payment of benefits in accordance with the applicable requirements of any qualified domestic relations order." Premium correctly points out, though, that the subject life insurance policy is an "employee welfare benefit plan" and not a "pension plan." Consequently, § 1056(3)(d)(3)(A) does not directly control the outcome here.

Premium reasons, by inference, that ERISA is silent with regard to enforcing QDROs relating to an employee welfare benefit plan. Therefore, Premium argues, "applicable state law must be consulted to determine the relative rights of the parties with respect to the Policy."

ERISA is not entirely silent on the issue. Section 1144(b)(7) expressly exempts all QDROs --not just those concerning pension plans-- from ERISA's sweeping preemption clause. A QDRO therefore is an enforceable "law." It would make

no sense for Congress to carefully preserve the QDRO, and its beneficiary designation or other disposition, merely to set up a conflict between the QDRO and the beneficiary designation in the plan documents.  Congress must have intended that the QDRO prevail over the beneficiary designation in the plan documents. Otherwise, either (1) the plan document would always prevail over the QDRO, in which case the QDRO rule is meaningless, or else (2) there would always be an irreconcilable conflict between the two instruments that could be resolved only by litigation.  Yet the QDRO rules were designed to provide instructions to the plan administrator on how to resolve any conflict without litigation, not to create new conflicts and litigation.

In creating the QDRO exemption, Congress intended "to give enhanced protection to the spouse and dependent children in the event of divorce ...." Boggs, 520 U.S. at 847.  "ERISA elevates a plan participant's legal obligations, commonly to a former spouse or children of a previous marriage, over the participant's express wishes to provide for other individuals as designated beneficiaries.  While this result may seem harsh to the designated beneficiary, the fact is that Congress _intended_ this displacement of a plan participant's wishes in some circumstances, in an effort to mitigate the impact of divorce upon children and former spouses." Tise, 234 F.3d at 425 (emphasis in original).

Given this backdrop, several circuits have concluded that a valid QDRO trumps a beneficiary designation in the plan

19 - OPINION AND ORDER

documents.  "Congress meant to make a QDRO the acceptable method for a divorced spouse to attach an interest in a former spouse's benefit plan.  ERISA thus maintains its own enforcement mechanism for aggrieved former spouses."  <u>Metropolitan Life Ins. Co. v. Pettit</u>, 164 F.3d 857, 863 (4th Cir. 1998).

Similarly, in the Tenth Circuit's view, "[b]lindly paying the proceeds as specified in the insurance company's beneficiary designation forms would be inconsistent with the statutory preemption exception that recognizes the validity of domestic relations orders affecting beneficiary designations."  <u>Carland</u>, 935 F.2d at 1121, *cited with approval* by <u>Tise</u>, 234 F.3d at 425.  "[W]hen a plan has notice of a divorce decree satisfying the requirements of section 1056(d)(3)(B)(i), the administrator may not contravene Congress's intent by ignoring that decree in favor of other documents on file."  <u>Id.</u> at 1121-22.

The Sixth Circuit reached a similar result in <u>Marsh</u>, 119 F.3d 415, as did the Seventh Circuit in <u>Wheaton</u>, 42 F.3d at 1083-84.  <u>See also</u> <u>Cronenwett</u>, 162 F. Supp.2d at 896, n.5 ("when a QDRO exists, it 'trumps' plan instruments, and the language of the QDRO controls the beneficiary designation .... In other words ... the beneficiary is determined by its language alone, without respect to any beneficiary designation form"); <u>Tolstad</u>, 527 N.W.2d at 671-72 (QDRO trumps beneficiary designation in plan documents); <u>Metropolitan Life Ins. Co. v. Gibbs</u>, 89 F. Supp.2d 877, 883 (E.D. Mich. 2000) ("state divorce decree that meets the qualifications of a QDRO is not preempted by ERISA and therefore

overrides a properly designated [life insurance] beneficiary");
Fowler, 922 F. Supp. at 14 (reversing court's previous position,
and concluding that the beneficiary designation made by the plan
participant must yield to the disposition mandated in the QDRO).

Some other cases, which at first glance may appear to
suggest a different result, are distinguishable.  In Equitable
Life Assurance Society of the United States v. Crysler, 66 F.3d
944 (8th Cir. 1995), the court concluded that federal law is
controlling, but could find no "ERISA provision that expressly
governs this dispute between benefit claimants."  Accordingly,
the court decided it would "apply federal common law," but "may
look to state law for guidance in developing federal common law,
[though] it is inappropriate to apply state law if it conflicts
with ERISA or its underlying policies."  Id. at 948-49.
Regardless of whether Crysler was correctly decided, it is
distinguishable because the divorce decree at issue there was not
a QDRO.  Id. at 947.

In Fox Valley & Vicinity Construction Workers Pension Fund
v. Brown, 897 F.2d 275 (7th Cir. 1990) (en banc), the parties
agreed the DRO was not a QDRO.  In addition, the issue was not
entitlement to benefits under a DRO, but whether an ex-spouse's
waiver of benefits in a DRO could override a beneficiary
designation in the plan documents.  Brandon v. Travelers Ins.
Co., 18 F.3d 1321 (5th Cir. 1994), likewise concerned a waiver of
benefits in a DRO.  That is an entirely different question from
the one presented here.  Because a QDRO, by definition, must be a

document that "recognizes the existence of an alternate payee's
right ... [to] receive all or a portion of the benefits payable
with respect to a participant in a plan," § 1056(d)(3)(B)(i), it
is doubtful that a mere waiver would trigger the QDRO rule.
O'Neill v. O'Neill, 136 F. Supp.2d 690, 694 (E.D. Mich. 2001);
Kuhn v. Metropolitan Life Ins. Co., 110 F. Supp.2d 589, 596 (W.D.
Mich. 1999) (divorce decree not enforceable as a QDRO because it
did not designate anyone as beneficiary of the life insurance
policy, but merely purported to extinguish ex-spouse's right to
claim benefits under the policy).

Manning v. Hayes, 212 F.3d 866 (5th Cir. 2000), addressed
whether a waiver of benefits in a prenuptial agreement could
override a beneficiary designation. Mohamed v. Kerr, 53 F.3d 911
(8th Cir. 1995), does not mention QDROs, and the parties agreed
ERISA was not applicable to their dispute. Gander, 250 F.3d 606,
cites ERISA as the jurisdictional basis for hearing the case in
federal court, but thereafter never mentions that statute again.

Williams, 82 F. Supp.2d 1346, is less easily distinguished.
The divorce decree specified that the life insurance proceeds be
paid to the participant's ex-wife, but he later designated his
girlfriend as sole beneficiary instead. The court determined
that the divorce decree was a QDRO, yet then looked to state law
to decide whether a divorce decree prevails over the competing
claim of a gratuitous transferee. Id. at 1353. While that is
one possible interpretation of ERISA, I do not find it
persuasive, for the reasons stated above.

Notably, the Ninth Circuit once attempted to employ a mode of analysis similar to that urged by Premium. In <u>Emard v. Hughes Aircraft Co.</u>, 153 F.3d 949 (9th Cir. 1998), a panel of this Circuit decided that ERISA did not preempt a widower from seeking to impose a constructive trust upon life insurance proceeds, which claim was based upon his rights to the proceeds under California community property law. The panel reasoned that "ERISA is designed to ensure that benefits are paid out. It is silent as to the disposition of those funds after their receipt by the beneficiary." <u>Id.</u> at 955. "[W]e see no indication that Congress intended to safeguard an individual beneficiary's rights to the proceeds of an ERISA insurance plan as against another person claiming superior rights, under state law, to those proceeds." <u>Id.</u> at 958.

That reasoning now appears to have been rejected by the United States Supreme Court. In <u>Boggs</u>, 520 U.S. 833, the Court held that ERISA preempts a Louisiana law that permitted a spouse to make a testamentary disposition of her community property interest in her husband's pension plan benefits. "It does not matter that [the beneficiaries of the will] have sought to enforce their rights only after the retirement benefits have been distributed since their asserted rights are based on the theory that they had an interest in the undistributed pension plan benefits." <u>Id.</u> at 854. It is difficult to reconcile this statement in <u>Boggs</u> with the reasoning in <u>Emard</u>.

/ / / /

Four years later, the Supreme Court held that ERISA preempts a Washington law that automatically revoked beneficiary designations in the event of divorce.  Egelhoff v. Egelhoff, 532 U.S. 141 (2001).  In the majority's view, the state law conflicted with ERISA because it sought to mandate a disposition other than that specified in the plan documents.  Id. at 147-48. The Court listed Emard among the decisions following the line of authority it disapproved.  Id. at 146.  See also Metropolitan Life Ins. Co. v. Buechler, 19 Fed. Appx. 678, 679 (9th Cir. 2001) (unpublished) ("the Supreme Court implicitly overruled Emard"); Connecticut General Life Ins. Co. v. Reiner, 351 F. Supp.2d 492, 497 (W.D. Va. 2005) (Emard abrogated by Egelhoff).  Accordingly, I cannot view Emard as controlling or even persuasive precedent.

The parties have not cited, nor have I found, any published decision involving the precise circumstance presented in this case, namely, a contention that an (alleged) bona fide purchaser for value prevails over a QDRO.  In the other cases that have come to my attention, the rival claimant typically was a donative beneficiary designated to receive the plan participant's life insurance benefit.

That distinction does not alter the outcome.  Except for the QDRO, ERISA preempts all state laws relating to the plan. § 1144.  A state law claim that seeks to alter the distribution of plan benefits has a connection with an ERISA plan, and therefore is preempted.  See Pettit, 164 F.3d at 862.  ERISA thus preempts Premium's theories based upon Oregon law, such as bona

fide purchaser for value.[13]

Ultimately, then, this is a simple case. If the Stipulated Judgment is a valid QDRO, then the Matots are entitled to the insurance policy proceeds. If the Stipulated Judgment is not a valid QDRO, then Premium prevails. Since I have determined that the Stipulated Judgment is a valid QDRO under the standards applied in this Circuit, judgment will be entered for the Matots.

Under the terms of the Stipulated Judgment, Roberta Matot is entitled to receive $50,000.00, and the three children are each entitled to $66,666.66, before any adjustments for interest.

Timothy Josh Matot has already received more than his share. He must disgorge the overpayment. He received $ 83,333.34. He was entitled to $66,666.66, so he was overpaid $16,666.68, before any adjustments for interest.

---

[13] To be sure, I do not suggest that ERISA necessarily preempts every claim two parties may have against each other that somehow concerns a life insurance policy procured as part of an employee welfare benefit plan. Had the Matots defrauded Premium, or breached a contract with Premium, it is conceivable that such claim might proceed independently from ERISA. Cf. Central States, Southeast & Southwest Areas Pension Fund v. Howell, 227 F.3d 672, 678-79 (6th Cir. 2000) (ERISA does not prevent imposition of constructive trust on theory that decedent violated a court order enjoining him from altering beneficiary designation); Neal v. General Motors Corp., 266 F. Supp.2d 449 (W.D.N.C. 2003) (permitting federal common law claim for unjust enrichment against estate that received benefits in error); Gibbs, 89 F. Supp.2d at 882, n.4 (contention that beneficiary designation was forged not preempted by ERISA); Mulligan, 210 F. Supp.2d at 898-900 (constructive trust theory can be used to enforce DRO in which ex-wife waived benefits, even though plan beneficiary designation was never formally changed). But cf. Boggs, 520 U.S. at 854 (indicating this theory has its limits).

It is not necessary to decide precisely what claims might survive preemption, since the parties here had no such interactions. Rather, any fraud or wrongdoing was perpetrated by the Decedent, who is not a party to this action.

Finally, it is only fair that Premium be reimbursed by the Matots, on a *quantum meruit* basis, for any premium payments that Premium and its predecessors made in order to keep the insurance policy in force after the Decedent assigned the policy to Evans. Although Premium may have intended to benefit itself, the Matots have benefitted from those payments. The parties should be able to agree on the amount, which shall be paid by the Matots on a *pro rata* basis, consistent with each person's share of the total insurance proceeds.

## ORDER

Roberta Matot is entitled to $50,000.00 of the proceeds from the $250,000 policy issued by Hartford insuring the life of William B. Matot. Timothy Josh Matot, Ian Matot, and Troy Matot, are each entitled to $66,666.66 of the policy proceeds. Timothy Josh Matot must disgorge $16,666.68, the amount he has received in excess of his share. The Matots shall reimburse Premium for the premium payments that Premium and its predecessors made to keep the insurance policy in force after the Decedent assigned the policy to Evans.

The parties shall submit an order reflecting the above disposition, and any appropriate adjustments for interest.

IT IS SO ORDERED.

DATED this ___3rd_____ day of August, 2005.

/s/ Owen M. Panner
_____
OWEN M. PANNER
U.S. DISTRICT COURT JUDGE